**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:          Justices:
Clifford W. Taylor      Michael F. Cavanagh
                        Elizabeth A. Weaver
                        Marilyn Kelly
                        Maura D. Corrigan
                        Robert P. Young, Jr.
                        Stephen J. Markman

FILED JULY 31, 2006

JUSTINE MALDONADO,

    Plaintiff-Appellee/
    Cross-Appellant,

v                     No. 126274

FORD MOTOR COMPANY,

    Defendant-Appellant/
    Cross-Appellee

and

DANIEL P. BENNETT,

    Defendant.

_____

BEFORE THE ENTIRE BENCH

CORRIGAN, J.

In this case we consider the essential authority of trial courts to control the proceedings before them. The issue in this case pertains to the extent of a trial court's authority to govern the conduct of counsel and their clients in court proceedings. Where the Michigan Constitution authorizes us to make rules to

govern court proceedings, the authority to enforce those rules inescapably follows. At the heart of preserving an organized polity, we must attend to relevant issues, including concerns over belligerent, antagonistic, or incompetent lawyering. To this end, we affirm the authority of trial courts to impose sanctions appropriate to contain and prevent abuses so as to ensure the orderly operation of justice.

We reiterate that trial courts possess the inherent authority to sanction litigants and their counsel, including the power to dismiss an action. *Banta v Serban*, 370 Mich 367, 368; 121 NW2d 854 (1963); *Persichini v Beaumont Hosp*, 238 Mich App 626, 639-640; 607 NW2d 100 (1999); *Prince v MacDonald*, 237 Mich App 186, 189; 602 NW2d 834 (1999). This power is not governed so much by rule or statute, but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases. See *Chambers v NASCO, Inc*, 501 US 32, 43; 111 S Ct 2123; 115 L Ed 2d 27 (1991).

We further acknowledge that our trial courts also have express authority to direct and control the proceedings before them. MCL 600.611 provides that "[c]ircuit courts have jurisdiction and power to make any order proper to fully effectuate the circuit courts' jurisdiction and judgments." Additionally, MCR 2.504(B)(1) provides that "[i]f the plaintiff fails to comply with these rules or a court order, a defendant may move for dismissal of an action or a claim against that defendant."

In the instant case, we consider whether the trial court abused its discretion in dismissing plaintiff's case because plaintiff and her attorneys repeatedly and

intentionally publicized inadmissible evidence so as to taint the potential jury pool, deny defendants a fair trial, and frustrate the due administration of justice. We conclude that because the trial court possessed the inherent authority to dismiss the action, and because the trial court warned plaintiff and her counsel that dismissal would result if they continued to publicize evidence ruled inadmissible by court order, the trial court did not abuse its discretion in dismissing plaintiff's case.

We also consider whether the trial court's dismissal of plaintiff's case because plaintiff intentionally disobeyed its explicit warning to refrain from publicizing information regarding defendant Daniel P. Bennett's excluded conviction violated the First Amendment. The trial court's limitation on the speech of plaintiff and her counsel was a narrow and necessary limitation aimed at protecting potential jurors from prejudice. See *Gentile v State Bar of Nevada*, 501 US 1030; 111 S Ct 2720; 115 L Ed 2d 888 (1991). The trial court's narrow restriction on speech did not offend the First Amendment. The Court of Appeals novel requirement that dismissal is improper unless the jury pool was actually tainted conflicts with the substantial likelihood of prejudice test of *Gentile.* Moreover, "actual taint" is an impossible and unworkable standard, especially where nearly three years have passed since the incidents occurred. Accordingly, we reverse the judgment of the Court of Appeals and reinstate the trial court's order dismissing plaintiff's complaint.

I. UNDERLYING FACTS AND PROCEDURAL HISTORY

Plaintiff Justine Maldonado, an employee of defendant Ford Motor Company, filed suit against Ford, alleging that a Ford supervisor, Daniel Bennett, sexually harassed her in violation of the Michigan Civil Rights Act (CRA), MCL 37.2101 *et seq.*[1] Ford (hereafter defendant) moved in limine to exclude evidence of Bennett's 1995 indecent exposure conviction. Judge Kathleen Macdonald, the original judge assigned to the case, granted defendant's motion and entered an order on February 16, 2001, excluding evidence of Bennett's prior conviction in this case and in another action brought against Bennett, *Elezovic v Ford Motor Co,* 472 Mich 408; 697 NW2d 851 (2005).[2] Plaintiff thereafter sought leave to appeal

---

[1] We have previously considered other actions in which Daniel Bennett was accused of sexual harassment, *Elezovic v Ford Motor Co*, 472 Mich 408; 697 NW2d 851 (2005), and *McClements v Ford Motor Co*, 473 Mich 373; 702 NW2d 166 (2005), mod 474 Mich 1201 (2005).

[2] In the *Elezovic* case, Judge Macdonald also issued an order directing that witnesses be instructed that reference to Bennett's excluded conviction or any other excluded evidence would be considered a contempt of court, and would result in sanctions, including compensation to the court in the case of a mistrial. All the witnesses in that case, including plaintiff Justine Maldonado, signed statements indicating that they had been advised of the court's ruling regarding inadmissible evidence, that they were not to mention any excluded evidence, and that they understood that sanctions would result from mentioning any excluded evidence.

As Justice Cavanagh notes, Judge Macdonald stated, upon entering the order of exclusion, that she might reconsider her decision to exclude the evidence during the course of the trial if need be. Justice Cavanagh, however, erroneously relies on this statement to conclude that plaintiff and her counsel were not precluded from "ever mentioning the indecent exposure conviction in public again . . . ." *Post* at 5 (emphasis omitted). Judge Macdonald's order remained in

(continued . . .)

to the Court of Appeals and this Court regarding Judge Macdonald's decision to exclude Bennett's prior conviction. Both the Court of Appeals and this Court denied plaintiff's application.[3]

On September 11, 2001, less than a month before a settlement conference scheduled for October 3, 2001, and shortly after a three-week trial resulting in a directed verdict for defendants in the *Elezovic* case, plaintiff's counsel issued a press release on firm letterhead that referred to Bennett's indecent exposure conviction, Judge Macdonald's exclusion of that conviction as evidence, and the impending trial in this case.[4] A series of news broadcasts and print media publications followed, replete with references to Bennett's prior conviction.[5]

_____

(. . . continued)
effect throughout this case. As such, plaintiff and her counsel were bound by the order.

[3] 465 Mich 971 (2002).

[4] Justice Weaver claims that plaintiff only, and not her counsel, made public statements about the excluded conviction after Judge Macdonald entered the order of exclusion. The September 11 press release, however, which referred to the excluded conviction, was issued by plaintiff's counsel after the order of exclusion was entered.

[5] The following is a list of the publications stemming from plaintiff's counsel's September 11, 2001, press release, many of which refer to Bennett's excluded conviction: (1) The Associated Press wire story, September 12, 2001, referencing the excluded conviction; (2) an article in the *Detroit Free Press*, September 13, 2001, referencing the excluded conviction; (3) an article by the United Press International, October 10, 2001, referencing the excluded conviction; (4) The Associated Press wire story, October 10, 2001, referencing the excluded conviction; (5) a Fox 2 news broadcast held at the law office of Scheff and Washington, October 10, 2001, referencing the excluded conviction and providing a closeup of the conviction papers; (6) a WDIV news broadcast, October 10, 2001,
(continued . . .)

5

On November 9, 2001, Bennett's indecent exposure conviction was expunged in district court proceedings.

By order dated January 11, 2002, Judge Macdonald established a trial date of July 8, 2002.

In February 2002, Judge Macdonald was assigned to the family division of the circuit court. Consequently, this case was reassigned by lot to Judge William Giovan. On May 17, 2002, Judge Giovan held a hearing regarding the admissibility of propensity evidence not currently at issue. Plaintiff's counsel invited the media to this hearing. Despite Judge Giovan's order closing the hearing to the media, plaintiff's counsel directed the media to wait outside until the hearing concluded to discuss details regarding the hearing.

Immediately following the hearing, Judge Giovan met with all counsel to discuss plaintiff's counsel's continued public references to Bennett's prior conviction despite Judge Macdonald's previous court order and the expungement of the conviction. Bennett's counsel pointed out that plaintiff's counsel's behavior

_____

(. . . continued)

referencing the excluded propensity evidence; and (7) an article in the *Oakland Press*, October 11, 2001, referencing the excluded conviction.

Justice Weaver contends that we assert that plaintiff's counsel referred to the excluded conviction in these publications. We assert no such thing. Rather, we merely state that these publications stem from plaintiff's counsel's September 11, 2001, press release. In other words, it was plaintiff's counsel's press release that prompted the mass of publications. Plaintiff's counsel's press release was designed to draw media attention to the excluded conviction and, as shown above, indeed accomplished its goal.

6

apparently violated MCL 780.623(5),[6] which criminalizes the divulgence, use, or publication of information regarding an expunged conviction. Plaintiff's counsel responded by stating that "it was worth the risk" to continue to publicize Bennett's expunged conviction.[7]

Judge Giovan declined to order plaintiff's counsel to obey MCL 780.623(5) because he considered it redundant to order an attorney to follow the law.[8] Despite Judge Giovan's expression of confidence that counsel would follow the law, plaintiff's counsel left the courtroom and met with the waiting media. This

---

[6] The expungement statute states:

> Except as provided in subsection (2), a person, other than the applicant, who knows or should have known that a conviction was set aside under this section and who divulges, uses, or publishes information concerning a conviction set aside under this section is guilty of a misdemeanor punishable by imprisonment for not more than 90 days or a fine of not more than $500.00, or both. [MCL 780.623(5).]

[7] Plaintiff's counsel's comments at this meeting also demonstrate that plaintiff's counsel continued to make public references to the excluded evidence despite the court order, contrary to Justice Weaver's contention.

[8] Justice Cavanagh mischaracterizes Judge Giovan's refusal to unnecessarily order an attorney to follow the law as a refusal to require the parties to refrain from referencing the excluded evidence. Justice Cavanagh's mischaracterization that "the trial court never thought it issued an order" in this case is preposterous. *Post* at 17. While Judge Giovan did not specifically enter a gag order, he did, on numerous occasions, direct the parties to abide by Judge Macdonald's order of exclusion, he subsequently denied plaintiff's motion to dissolve the order, and he orally warned the parties that dismissal would result for failure to abide by the order. Moreover, Justice Cavanagh's mischaracterization of the lower court transcript is rebutted by plaintiff's own comment, "If we don't act the way he [Judge Giovan] wants it, the way he sees fit, then he'll dismiss my case with prejudice."

meeting resulted in extensive television news and press coverage, some of which again referred to Bennett's expunged conviction and the possible exclusion of the propensity evidence.[9] Shortly thereafter, plaintiff's counsel again discussed this case at a May 28 public meeting and a June 1, 2002, rally in Ann Arbor sponsored by BAMN (Coalition to Defend Affirmative Action, Integration & Immigrant Rights and Fight for Equality by any Means Necessary).[10]

Plaintiff subsequently moved to dissolve Judge Macdonald's order excluding Bennett's prior conviction from evidence. On June 13 and 21, 2002, Judge Giovan heard the motion. During that hearing, plaintiff's counsel mentioned that an article had been published in the June 12-18, 2002, issue of the *Metro-Times*, a free weekly publication readily available in the courthouse where jury selection was imminent. The article appeared on the front page of the

---

[9] The following is a list of the publications stemming from plaintiff's counsel's May 17, 2002, meeting with the media, some of which also referred to evidence that had been excluded before trial: (1) a WDIV news broadcast, May 17, 2002, referencing the excluded propensity evidence; (2) a WXYZ news broadcast, May 17, 2002, also referencing the excluded propensity evidence; and (3) The Associated Press local wire story, May 17, 2002, referencing the expunged conviction.

Again, contrary to Justice Weaver's contention, we do not assert that plaintiff's counsel actually made references to the excluded evidence in these publications. Rather, we assert that these publications stem from plaintiff's counsel's meeting with the media.

[10] Plaintiff's counsel, George Washington, Miranda Massie, and Jodi Masley, are all members of the BAMN organization.

8

newspaper and referenced Bennett's expunged conviction. This article prompted

the following colloquy:

> *The Court*: But, you know, since you mentioned the article, where's this coming from? I thought that there is a prohibition against counsel speaking to—making public statements designed to affect trial.

> *Ms. Hardy* [defense counsel]: There certainly is. There's an ethics rule which prohibits counsel from intentionally trying to taint a jury pool by making the public aware of excluded evidence, which is exactly what's been occurring for quite some time.

> *The Court*: Is counsel being quoted in this?

> *Mr. Washington* [plaintiff's counsel]: I think counsel on both sides. Ford was not, but Mr. Morgan and Ms. Massie and I were both quoted, all quoted.

> *The Court*: *I'm* not sure—well—

> *Ms. Hardy*: It was initiated, without a doubt, and Mr. Washington will not dispute this, by Mr. Washington, as all the press has been initiated by his office, and the constant publicity is one issue, but *the really serious issue is the effort by Mr. Washington to make sure that the press continues to report evidence or information concerning this expunged conviction so that some way, somehow, irrespective of this Court's ruling*—[11]

---

[11] Although the article contained quotations from both plaintiff's counsel and defense counsel, defendant claimed that plaintiff's attorney provided the reporter with the extensive information in the article regarding Bennett's excluded conviction. Plaintiff did not deny this allegation.

Justice Cavanagh contends that because Bennett's counsel, on two occasions, referred publicly to Bennett's excluded conviction, plaintiff should not be punished for behaving as defense counsel did. We acknowledge that Bennett's counsel publicly referred to Bennett's excluded conviction. We disagree, however, that defense counsel's behavior mirrored that of plaintiff and her counsel. Bennett's counsel's limited references to the excluded evidence were

(continued . . .)

9

*The Court*: I'm not making any decisions about this, but I'm going to tell you one thing. *If I ever reach the conclusion that somebody is violating that ethical obligation and causing some difficulty in our getting a fair jury, I will dismiss the case with prejudice*, or, and I should say, on the other side, grant a default judgment. I just want everyone to know that. And then whatever counsel is involved can answer to their client. [Emphasis added.]

The court denied the motion to dissolve Judge Macdonald's previous order of exclusion.

Three days later, on June 24, 2002, plaintiff was deposed, at which time she admitted that she had disclosed facts regarding Bennett's expunged conviction despite the trial court's order disallowing such evidence. The following colloquy took place:

[*Defense counsel*]: If you can give me a ballpark figure, how many times since you found out about the expungement have you told other people about the fact that Mr. Bennett had this conviction that was later expunged?

[*Plaintiff's counsel*]: You mean at people, period, one person at a time?

[*Defense counsel*]: Any individual, whetherit's groups, how many times has she gone out and publicized it, divulged it.

[*Plaintiff*]: I have no idea. It's been a lot.

_____

(. . . continued)

prompted by plaintiff and her counsel. Defense counsel's statements were made in an attempt to minimize the damage caused by plaintiff's and her counsel's numerous public references to the excluded evidence. Unlike plaintiff's and her counsel's public comments regarding the excluded evidence, defense counsel's comments were not intended to taint the potential jury pool and cause prejudice to plaintiff.

*Q*:     Over 100?

*A*:     I don't know.

*Q*:     Over ten?

*A*:     Oh, definitely over ten, possibly over 100.

*Q*:     Okay.

*A*:     If I could get it out on the Internet, I would put it out on the Internet.

Moreover, plaintiff admitted during her deposition on June 24, 2002, that she would continue to disclose facts regarding Bennett's expunged conviction. She stated:

*A*:     I'm aware that you're whining and crying because I'm talking about it all over town, yes, I am aware of that. I won't shut up about it. It's the truth. You can expunge it, but it's the truth, and I'm going to tell it, and you know what? I will tell anybody that will listen because this man is a menace and he must be stopped, and you know it and you know it [sic]. But you guys want to protect him, that's fine, I'm not. I don't have to protect Mr. Bennett.

*Q*:     So you've been talking about it—

*A*:     To anyone.

*Q*:     —any chance you get, to anyone—

*A*:     That's Right.

*Q*:     —even though-even since you became aware that it was expunged?

*A*:     Yes. Absolutely.

11

On June 26, 2002, two days after the deposition, plaintiff and certain of her counsel participated in a "Justice for Justine Committee" demonstration outside Ford headquarters. During the demonstration, participants distributed leaflets to the public containing information regarding Bennett's expunged conviction and evidence regarding Bennett's alleged behavior toward other female Ford employees that the trial court had ruled inadmissible. The leaflet also stated that Judge Giovan "is in Ford's pocket" and "is trying to keep the truth out of the courtroom." Also on this day, a television interview was broadcast on WDIV Channel 4, in which plaintiff stated:

> If we don't act the way he [Judge Giovan] wants it, the way he sees fit, then he'll dismiss my case with prejudice. And what he doesn't know is, it doesn't bother me, because I'm not going to quit fighting against sexual harassment.

A demonstration similar to that held on June 26, 2002, was held the following day at the Ford Wixom plant, at which a similar leaflet was distributed.[12]

On June 28, 2002, defendants moved to dismiss plaintiff's suit on the basis that plaintiff and her counsel engaged in improper pretrial publicity aimed at

---

[12] The following publications stemmed from the June 26 and 27 demonstrations: (1) a WDIV news broadcast, June 26, 2002, showing picketers holding signs stating, "Ford, stop buying judges"; (2) a Click on Detroit, Channel 4 website article, June 26, 2002, referencing the exclusion of the propensity evidence; and (3) an article in the *Detroit News*, June 27, 2002.

tainting the potential jury pool. On July 1, 2002, plaintiff responded by moving to disqualify Judge Giovan. On July 3, 2002, Judge Giovan heard and denied this motion. The same day, plaintiff's counsel, Miranda Massie, appeared in a television interview broadcast on WDIV, Channel 4. She stated:

> Metro Detroit has a company town feeling, and it's hard to get a fair hearing from any of these judges when you're going against the Ford Motor Company. They'll stop at nothing to maintain the culture of abuse that exists in those plants, and we've found it hard to get unbiased judicial rulings in these cases.[13]

On July 8, 2002, the date on which jury selection was to begin, Judge Timothy Kenny heard plaintiff's appeal of Judge Giovan's denial of the motion for his disqualification and affirmed the denial. Also on July 8, 2002, Judge Giovan heard defendant's motion to dismiss.[14] Throughout the hearing, plaintiff and her counsel were discourteous to and uncooperative with the court. Specifically, in response to the court's question, "Are you a member of the 'Justice for Justine' committee?" plaintiff's counsel, Jodi Masley, responded by stating:

> Nobody's ever asked me that in my life. I—you know what. I fully support the "Justice for Justine", you know, committee. They have every right to do everything they [want]. And did I participate

---

[13] As a result of this news broadcast, the following publications were released: (1) a Click on Detroit, Channel 4 website article, July 3, 2002, referencing plaintiff's and her counsel's belief that Judge Giovan was biased and (2) a Channel 50 news broadcast, July 3, 2002, in which plaintiff stated that money cannot buy justice.

[14] Also on this day, an article was published on the Click on Detroit, Channel 4 website concerning Judge Giovan's alleged bias.

in a demonstration that was called by the "Justice for Justine" committee, I did.

Judge Giovan attempted to respond to Ms. Masley's comment, but she interrupted him, stating, "I mean, have I or have I ever been a member of the Communist Party, is that what this is?"  Moreover, in response to Judge Giovan's inquiry regarding whether members of the "Justice for Justine" committee were present in the court, Ms. Masley stated:

> Have you guys even ever heard of the phrase "Freedom of association . . . ?"

> \* \* \*

> I have no idea.  Do they need to know—identify their political affiliations . . . ?

> \* \* \*

> (Interposing) Who did you guys vote for in the last judicial election?

The hearing continued into the following day.  At the conclusion of the two-day hearing, plaintiff requested permission to file a supplemental brief, which Judge Giovan granted.

On August 21, 2002, Judge Giovan issued an opinion and order dismissing plaintiff's case with prejudice, concluding that plaintiff and her counsel had

engaged in premeditated misconduct designed to tamper with the administration of justice and that no lesser sanction would deter plaintiff or her counsel.[15]

The Court of Appeals, affirmed in part, reversed in part, and acknowledged the trial court's authority to dismiss plaintiff's complaint, but remanded the case to the trial court to hold an evidentiary hearing to determine whether plaintiff's and her counsel's comments actually prejudiced the jury pool.[16]

---

[15] Justice Weaver contends that Judge Giovan improperly attributed responsibility for plaintiff's improper references to plaintiff's counsel. As these facts clearly demonstrate, however, Judge Giovan properly determined that both plaintiff and her counsel engaged in behavior designed to taint the potential jury pool.

Justice Weaver further contends that plaintiff was not restricted by any order or court rule from making repeated public references to Bennett's prior conviction. While we disagree with the contention that no order or court rule barred plaintiff from making pubic references to the excluded evidence, we reiterate that, whether a court order existed or whether a court rule applied, plaintiff was not free to repeatedly publicize excluded evidence, especially with the trial impending. The only conclusion that can logically be drawn from plaintiff's repeated references to the excluded conviction is that plaintiff was improperly attempting to admit the excluded evidence by means of the mass media. Consequentially, Judge Giovan chose a principled option within his authority in dismissing plaintiff's case in order to protect the administration of justice. *Banta, supra* at 368; *Cummings v Wayne Co*, 210 Mich App 249, 252; 533 NW2d 13 (1995), citing *Buchanan Home & Auto Supply Co v Firestone Tire & Rubber Co,* 544 F Supp 242, 244-245 ( D SC, 1981).

[16] Unpublished opinion per curiam of the Court of Appeals, issued April 22, 2004 (Docket No. 243763).

Defendant sought leave to appeal to this Court. We directed the clerk to schedule oral argument on whether to grant the application or to take other peremptory action.[17]

## II. STANDARD OF REVIEW

This case requires us to determine whether the Court of Appeals erred in reversing the trial court's dismissal of this case. Trial courts possess the inherent authority to sanction litigants and their counsel, including the right to dismiss an action. *Banta, supra* at 368. "An exercise of the court's 'inherent power' may be disturbed only upon a finding that there has been a clear abuse of discretion." *Brenner v Kolk*, 226 Mich App 149, 160; 573 NW2d 65 (1997). A trial court's dismissal of a case for failure to comply with the court's orders is also reviewed for an abuse of discretion. *Thorne v Carter*, 149 Mich App 90, 93; 385 NW2d 738 (1986); MCR 2.504(B)(1).

In *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003), this Court noted that an abuse of discretion standard must be one that is more deferential than review de novo, but less deferential than the standard set forth in *Spalding v Spalding,* 355 Mich 382; 94 NW2d 810 (1959). This Court stated that "an abuse of discretion standard acknowledges that there will be circumstances in which there will be no single correct outcome; rather, there will be more than one reasonable and principled outcome." *Babcock, supra* at 269. The *Babcock* Court

---

[17] 471 Mich 940 (2004).

further noted that "[w]hen the trial court selects one of these principled outcomes, the trial court has not abused its discretion and, thus, it is proper for the reviewing court to defer to the trial court's judgment." *Id.* While *Babcock* dealt with a criminal sentencing issue, we prefer the articulation of the abuse of discretion standard in *Babcock* to the *Spalding* test and, thus, adopt it as the default abuse of discretion standard.

Additionally, in cases raising First Amendment issues, an appellate court is obligated to independently review the entire record to ensure that the lower court's judgment """"does not constitute a forbidden intrusion of the field of free expression."""" *Gentile, supra* at 1038, quoting *Bose Corp v Consumers Union of United States, Inc,* 466 US 485, 499; 109 S Ct 1949; 80 L Ed 2d 502 (1984), quoting *New York Times Co v Sullivan*, 376 US 254, 258; 84 S Ct 710; 11 L Ed 2d 686 (1964).

## III. ANALYSIS

### A. Trial Court's Authority to Sanction Litigants for Unethical Behavior

As stated above, trial courts possess the inherent authority to sanction litigants and their counsel, including the power to dismiss an action. *Banta, supra* at 368. "The authority to dismiss a lawsuit for litigant misconduct is a creature of the 'clean hands doctrine' and, despite its origins, is applicable to both equitable and legal damages claims." *Cummings v Wayne Co*, 210 Mich App 249, 252; 533 NW2d 13 (1995), citing *Buchanan Home & Auto Supply Co v Firestone Tire & Rubber Co,* 544 F Supp 242, 244-245 (D SC, 1981). "The authority is rooted in a

17

court's fundamental interest in protecting its own integrity and that of the judicial process." *Cummings, supra* at 252. "The 'clean hands doctrine' applies not only for the protection of the parties but also for the protection of the court." *Id.*, citing *Buchanan Home, supra* at 244.

Moreover, the Michigan Constitution confers on the judicial department all the authority necessary to exercise its powers as a coordinate branch of government. "Const 1963, art 3, § 2 divides the powers of government among three branches and commits to each branch exclusive exercise of the functions properly belonging to it, except as otherwise expressly provided in the Constitution."[18] *In re 1976 PA 267*, 400 Mich 660, 662; 255 NW2d 635 (1977). "Art 6, § 1 vests the judicial power of the state exclusively in one court of justice."[19] *Id.* "Section 4 of that article[20] vests general superintending control

---

[18] Const 1963, art 3, § 2 provides:

> The powers of government are divided into three branches; legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in the constitution.

[19] Const 1963, art 6, § 1 provides:

> The judicial power of the state is vested exclusively in one court of justice which shall be divided into one supreme court, one court of appeals, one trial court of general jurisdiction known as the circuit court, one probate court, and courts of limited jurisdiction that the legislature may establish by a two-thirds vote of the members elected to and serving in each house.

[20] Const 1964, art 6, § 4 provides:

(continued . . .)

over all courts in the state in the Supreme Court and § 5 confers upon this Court the power to make rules to govern the practice and procedure within the courts."[21] *Id.* "It is also well settled that under our form of government the Constitution confers on the judicial department all the authority necessary to exercise its powers as a coordinate branch of government." *Id.* at 662-663. "The judicial powers derived from the Constitution include rulemaking, supervisory and other administrative powers as well as traditional adjudicative ones." *Id.* at 663. "They have been exclusively entrusted to the judiciary by the Constitution and may not be diminished, exercised by, nor interfered with by the other branches of government without constitutional authorization." *Id.*, citing *Attorney General ex rel Cook v O'Neill*, 280 Mich 649; 275 NW 445 (1937).

Moreover, express authority to dismiss a complaint is conferred by statute and court rule in Michigan. MCL 600.611 provides that "[c]ircuit courts have jurisdiction and power to make any order proper to fully effectuate the circuit

_____

(. . . continued)

> The supreme court shall have general superintending control over all courts; power to issue, hear and determine prerogative and remedial writs; and appellate jurisdiction as provided by rules of the supreme court. The supreme court shall not have the power to remove a judge.

[21] Const 1964, art 6, § 5 provides:

> The supreme court shall by general rules establish, modify, amend and simplify the practice and procedure in all courts of this state. The distinctions between law and equity proceedings shall, as far as practicable, be abolished. The office of master in chancery is prohibited.

courts' jurisdiction and judgments." Additionally, MCR 2.504(B)(1) provides that "[i]f the plaintiff fails to comply with [the court] rules or a court order, a defendant may move for dismissal of an action or a claim against that defendant."

Several of the Michigan Rules of Professional Conduct address sanctionable attorney conduct. MRPC 3.6 concerns trial publicity. It provides:

> A lawyer shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the *lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding*. [Emphasis added.]

MRPC 3.5 addresses impartiality and decorum of the tribunal. It states:

> A lawyer shall not:
>
> (a) *seek to influence a* judge, juror, *prospective juror* or other official *by means prohibited by law*;
>
> (b) communicate ex parte with such a person concerning a pending matter except as permitted by law; or
>
> (c) engage in undignified or discourteous conduct toward the tribunal. [Emphasis added.]

Finally, MRPC 8.4 deals with attorney misconduct. It provides, in relevant part:

> It is professional misconduct for a lawyer to:
>
> (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
>
> (b) engage in conduct involving dishonesty, fraud, deceit, misrepresentation, or violation of the criminal law, where such conduct reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer;

(c) engage in conduct that is prejudicial to the administration of justice.

## B  The Trial Court's Authority to Dismiss this Case

In this case, Judge Macdonald initially concluded that evidence of Bennett's prior conviction was inadmissible before the jury because of its unduly prejudicial nature.  Rather than abiding by the trial court's order, even after both the Court of Appeals and this Court denied plaintiff leave to appeal regarding the order, plaintiff and her counsel engaged in a concerted and wide-ranging campaign in the weeks before various scheduled trial dates to publicize the details of the inadmissible evidence through the mass media and other available means.  They continued to do so even after the trial court explicitly warned them that such misconduct would result in the dismissal of plaintiff's lawsuit.

The trial court has a gate-keeping obligation, when such misconduct occurs, to impose sanctions that will not only deter the misconduct but also serve as a deterrent to other litigants.

Moreover, MCL 600.611 and MCR 2.504(B)(1) provide the trial court with the authority to impose sanctions such as dismissal.  Here, Judge Macdonald issued an order excluding evidence regarding Bennett's expunged conviction.  Judge Giovan later reaffirmed Judge Macdonald's initial order of exclusion, and

21

explicitly warned the parties that he would dismiss the case if the inappropriate remarks regarding the excluded conviction continued.[22]

---

[22] Both Justice Cavanagh and Justice Weaver claim that Judge Giovan's warning to refrain from engaging in pretrial publicity was not an order of the court. In doing so, they rely on Judge Giovan's statement that he "never issued a gag order" in this case. The dissenting justices, however, take this statement out of context. Judge Giovan clearly explained that a gag order was not necessary because rules were already in place governing pretrial publicity:

> So, what I say, I'm not going to issue a gag order because the rules of professional conduct already have a standard that bind you. So, why should Judge Giovan, who is only one of thousands of judges, select his own criteria for what people should say when we have standing rules that govern what attorneys are permitted to say?

> And one of the things that attorneys are not permitted to do is to make public statements that are intended to influence the outcome of a case. And when your opponents after several times coming to court accusing you and your colleagues and maybe the parties themselves of doing precisely that, I took no action.

> But after—on the day that this did occur, I had seen a long article about this case, I had heard counsel say on many occasions, as you have said here today, that you have invited public examination of this case, all I said was that if I should find that the rules were violated, I would take corrective action, which could include dismissing the case.

> Now, I was not referring to some mysterious, illusory, ambiguous rule fixed in my mind and known to nobody else. It's obvious I was not saying that, that I was going to take action or not based on a rule that I invented and disclosed to no one.

> What was obvious to anyone that what I was saying is that if I found that the rule of professional conduct was violated, that is to say that counsel or parties were making public statements intended to affect the outcome of this case, I would take action.

22

Plaintiff's understanding of Judge Macdonald's order and Judge Giovan's warning to adhere to the order was clearly demonstrated in her deposition and in the June 26, 2002, television interview that was broadcast on WDIV Channel 4 in which she acknowledged Judge Giovan's warning that dismissal would result if she continued her behavior, but further stated that "it doesn't bother me, because I'm not going to quit fighting against sexual harassment."

Plaintiff's counsel also clearly understood Judge Macdonald's order and Judge Giovan's explicit warning to adhere to the order. The trial court twice explicitly discussed the improper conduct with plaintiff's counsel and warned everyone about the consequences of continuing misconduct. Despite the warning, and despite the approaching trial, plaintiff and her counsel continued the misconduct.[23] In fact, as Judge Giovan noted, plaintiff's lead counsel, George

---

[23] Justice Cavanagh suggests that Judge Giovan's warning not to discuss the excluded conviction with the press was somehow insufficient to convey to the parties that they were not to discuss the excluded conviction with the media. *Post* at 7-9. We strongly disagree. The transcript of this exchange, which we have set forth on pages 9 to 11 of this opinion, makes it quite clear that the parties were advised in no uncertain terms that references to the excluded conviction were to cease. Contrary to Justice Cavanagh's assertion, Judge Giovan explicitly warned the parties and the attorneys that further references to the excluded conviction would result in dismissal. Although Judge Giovan did not embody this warning in a written order, the warning did not consist of "general comments . . . made in passing to both parties." *Post* at 11. Rather, the warning was explicit and made on the record in open court. All involved were clearly aware of what was prohibited. To require a formal written order—as it appears Justice Cavanagh would—would be to permit any litigant or attorney to disregard an explicitly conveyed and clearly understood obligation on the ground that it was not

(continued . . .)

Washington and Miranda Massie, appeared in television news broadcasts that specifically referred to Bennett's expunged conviction. Moreover, plaintiff's counsel acknowledged that counsel could possibly be violating the expungement statute by publicly disseminating information regarding Bennett's expunged conviction, but stated that it was "worth the risk." Also of note is Ms. Masley's statement at the July 8, 2002, hearing that "Ms. Maldonado has a right to speak about Mr. Bennett's conviction for sure." She further stated that plaintiff and her counsel, depending on how close it was to trial, had the right to publicize evidence that had been excluded by the court.

Judge Giovan properly noted that, notwithstanding the rulings of two judges and the apparent illegality of disclosing Bennett's excluded conviction, nothing would deter plaintiff from continuing to publicize information regarding Bennett's excluded conviction. Plaintiff so admitted in her deposition. Even without an explicit order precluding plaintiff and her counsel from publicizing Bennett's excluded conviction, Judge Giovan chose a principled option in dismissing plaintiff's case in order to protect the administration of justice. The

_____

(. . . continued)
communicated in a written order. Such a rule would lead only to gamesmanship and we decline to adopt it.

Plaintiff was well aware of Judge Giovan's explicit warning to refrain from making public references to the excluded conviction and of the consequences of failing to abide by the warning. Moreover, as demonstrated throughout this opinion, plaintiff failed to abide by the warning on numerous occasions.

imposition of any lesser sanction would have been unjust in light of plaintiff's and her counsel's flagrant misbehavior.[24]

Not only did plaintiff and her counsel disregard Judge Macdonald's order and Judge Giovan's explicit warning to respect the order, counsel violated numerous rules of professional conduct. Plaintiff's counsel's public references to Bennett's excluded conviction violated MRPC 3.6, which was the basis for Judge Giovan's dismissal. Plaintiff's counsel reasonably knew or should have known that their comments would have a substantial likelihood of materially prejudicing the proceedings by improperly influencing prospective jurors regarding Bennett's propensities to commit sexual harassment, especially since trial was approximately two weeks away.

Plaintiff argues that Judge Giovan improperly relied on MRPC 3.6 in dismissing plaintiff's case. She contends that Judge Giovan's dismissal was solely based on plaintiff's comments, and that MRPC 3.6 does not apply to nonlawyers. Plaintiff correctly argues that the Michigan Rules of Professional Conduct do not

---

[24] Justice Cavanagh suggests that the trial court had "numerous other options" available to it as sanctions apart from dismissal. *Post* at 17. Even if we agreed with this assertion, it is irrelevant in determining whether the sanction actually chosen—dismissal in this case—was within the range of "reasonable and principled outcome[s]." *Babcock, supra* at 269. In light of the repeated violation of the court's instruction not to publicize the excluded conviction, we cannot say that Judge Giovan's conclusion that nothing short of dismissal would deter plaintiff and counsel's repeated misconduct was incorrect. As such, even if we were to assume that there were other sanctions available—which we do not necessarily believe to be the case—the sanction of dismissal was clearly within the range of reasonableness under the circumstances.

apply to nonlawyers, but mistakenly contends that Judge Giovan relied only on her behavior in ordering a dismissal. Plaintiff also erroneously contends that she is free to engage in improper pretrial publicity designed to taint the potential jury pool. The Michigan Court Rules do apply to plaintiff. They authorize the trial court to impose sanctions such as dismissal for party misconduct. MCR 2.504(B)(1). Judge Giovan expressly warned plaintiff that if she continued to disseminate information regarding Bennett's excluded conviction in violation of Judge Macdonald's order, he would dismiss her case. Plaintiff failed to obey this warning and, thus, Judge Giovan properly dismissed her case.[25] In any event, even if plaintiff is not bound by MRPC 3.6, plaintiff's counsel's repeated public references to Bennett's excluded conviction, coupled with Ms. Massie's statement five days before trial that "Metro Detroit" judges were biased in favor of the Ford Motor Company, were substantially likely to materially prejudice the proceedings and improperly influence prospective jurors.

Judge Giovan did not reach a conclusion regarding a possible violation of MRPC 3.5, finding it was unnecessary because he dismissed the case under MRPC

---

[25] Justice Cavanagh contends that we attempt to portray Judge Macdonald's order excluding Bennett's prior conviction as having the same effect as an order precluding any mention of this evidence in public. We, however, do not misconstrue the order of exclusion as an order precluding any mention of the evidence in public. Rather, we rely on the order of exclusion in concluding that plaintiff's and her counsel's numerous references to the excluded evidence just weeks before trial was to begin constituted premeditated misconduct designed to taint the potential jury pool, deny defendants a fair trial, and frustrate the due administration of justice.

3.6.   Because Judge Giovan did not rely on this rule in dismissing the case, we need not reach a conclusion regarding a possible violation of the rule.   We nevertheless enumerate plaintiff's counsel's acts of disrespect against the trial court to highlight plaintiff's counsel's undignified and discourteous conduct toward the trial court.

Plaintiff's counsel, on numerous occasions, despite court orders and an explicit warning by the trial court, publicly divulged information regarding Bennett's excluded conviction. Plaintiff's counsel also deliberately disregarded the trial court's oral directive to refrain from disseminating information regarding Bennett's excluded conviction.  Ms. Masley sarcastically responded to the trial court's questioning at the dismissal hearing, and at one point, while on the stand, turned to members of the "Justice for Justine" committee present in the courtroom and asked them who they voted for in the last judicial election.  Additionally, Ms. Massie commented during a July 3, 2002, television interview that "Metro Detroit" judges are biased toward the Ford Motor Company.  While this conduct may not amount to a violation of MRPC 3.5, it further justifies Judge Giovan's dismissal for plaintiff's and her counsel's participation in pretrial publicity designed to taint the jury pool.

We also note MRPC 8.4, although Judge Giovan did not rely on this rule in ordering dismissal.  MRPC 8.4 prohibits lawyers from engaging in conduct that is prejudicial to the administration of justice. MRPC 8.4(a) prohibits lawyers from engaging in misconduct through the acts of others.  Here, plaintiff's counsel not

only failed to restrain plaintiff from repeatedly and intentionally publicizing Bennett's inadmissible expunged conviction in order to taint the potential jury pool and deny defendants a fair trial, they participated with plaintiff in the misconduct on numerous occasions. This inappropriate and unprofessional conduct directly violated Judge Macdonald's order, Judge Giovan's reaffirmance of the order, and Judge Giovan's explicit warning. Moreover, this conduct was directly aimed at frustrating the due administration of justice. It also supports the dismissal of plaintiff's complaint.

C.  The First Amendment and a Trial Court's Ability to Restrict Speech

The First Amendment guarantees that the freedom of speech shall not be abridged. It states:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances. [US Const, Am I.]

In *Gentile*, the United States Supreme Court addressed the standard governing the state's ability to discipline an attorney under an ethical rule that is identical in all relevant respects to MRPC 3.6, regarding speech about parties or proceedings in which an attorney is involved. The Court rejected the petitioner attorney's claim that he should be held to the "clear and present danger" standard applicable to the press, and concluded that "the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than

28

that established for regulation of the press." *Gentile, supra* at 1074. The Court, in

an opinion by Chief Justice Rehnquist, explained:

> We agree with the majority of the States that the "substantial likelihood of material prejudice" standard constitutes a constitutionally permissible balance between the First Amendment rights of attorneys in pending cases and the State's interest in fair trials.
>
> When a state regulation implicates First Amendment rights, the Court must balance those interests against the State's legitimate interest in regulating the activity in question. The "substantial likelihood" test . . . is constitutional . . . for it is designed to protect the integrity and fairness of a state's judicial system and it imposes only narrow and necessary limitations on lawyers' speech. The limitations are aimed at two principal evils: (1) comments that are likely to influence the actual outcome of the trial, and (2) *comments that are likely to prejudice the jury venire*, *even if an untainted panel can ultimately be found*. [*Id.* at 1075 (emphasis added).]

The Court noted that "[l]awyers representing clients in pending cases are

key participants in the criminal justice system, and the State may demand some

adherence to the precepts of that system in regulating their speech as well as their

conduct." *Id.* at 1074. The Court further observed that "[f]ew, if any, interests

under the Constitution are more fundamental than the right to a fair trial by

'impartial' jurors, and an outcome affected by extrajudicial statements would

violate that fundamental right." *Id.* at 1075.

Judge Giovan, after reviewing *Gentile,* found a substantial likelihood of

prejudice:

> More important, however, is that the plaintiff should not be heard to make her argument, which goes like this: "We deny that our behavior was intended to have a substantial likelihood of

prejudice.  But even if you establish that it was, you cannot dismiss the plaintiff's case until you establish that it has achieved its intended effect."

We believe otherwise.  That is not an acceptable standard for preserving the integrity of a court system.  The behavior in question has been intentional, premeditated, and intransigent.  It was designed to reach the farthest boundaries of the public consciousness.  It should be presumed to have had its intended effect.

The Court of Appeals acknowledged that the applicable test under *Gentile* is whether the conduct generated a "substantial likelihood" of prejudice, yet remanded for an evidentiary hearing to determine whether "actual" prejudice occurred.

We hereby affirm the trial court's understanding of *Gentile*.  Plaintiff's and her counsel's numerous public references to Bennett's inadmissible, expunged indecent exposure conviction, despite a court order excluding such evidence, were obviously intended to prejudice potential jurors.  The trial court thus warned the parties and counsel that all public references to the expunged conviction in violation of the ethical rules would result in dismissal.  This limitation on plaintiff's and her counsel's speech only applied to speech that was substantially likely to have a materially prejudicial effect and that, therefore, violated the rules of ethics.  It did not prohibit plaintiff and her counsel from speaking about sexual harassment or the general nature of plaintiff's case.  Judge Giovan, at the dismissal hearing, acknowledged the importance of upholding the First Amendment and

drew a distinction between protected speech and speech merely designed to thwart the judicial process. He stated to defense counsel:

> Well, now, before we move further, I think you understand that we need to draw a distinction between a party's willingness and right to disseminate to the public their ideas of how they've been unjustly treated and the like, and even criticism of the Court as opposed to what's really at stake here, and that is efforts to thwart the judicial system, and that is to disseminate, for example, excluded evidence and evidence forbidden to be disseminated by statute, which you have referred to. But nevertheless, you do need to differentiate between those two things.

The rules of evidence are designed to ensure fairness in the administration of justice, eliminate unjustifiable expense and delay, and promote the growth and development of the law of evidence. MRE 102. Judge Macdonald's exclusion of Bennett's expunged conviction was based on the rules of evidence. She specifically relied on MRE 404(b) in excluding the evidence, determining that the evidence would not be offered for any purpose other than to show Bennett's propensity to conduct himself in this manner. Judge Macdonald further relied on MRE 403 to determine that, even if the evidence were relevant, its undue prejudice substantially outweighed its probative value in light of the availability of alternative means of proof. Judge Macdonald's ruling, and Judge Giovan's subsequent limitation on plaintiff's and her counsel's speech, was in accord with the purpose of the evidentiary rules. Moreover, the rulings were necessary to protect defendants' fundamental right to a fair trial and were directly aimed at protecting potential jurors from prejudice.

As the United States Supreme Court noted in the *Gentile* case, few, if any, interests are more fundamental than the right to a fair trial by an impartial jury. Plaintiff stated that nothing would deter her from continuing to publicize Bennett's expunged conviction, and that she would post it on the Internet if she could. Additionally, plaintiff's counsel, despite court orders, publicly divulged information regarding the excluded expunged conviction. Judge Giovan merely exercised his "'affirmative constitutional duty' to minimize the potential for prejudicial pretrial publicity," *United States v Houbriti*, 307 F Supp 2d 891, 897 (ED Mich, 2004), quoting *Gannett Co, Inc v DePasquale*, 443 US 368, 378; 99 S Ct 2898; 61 L Ed 2d 608 (1979), in dismissing plaintiff's case, and did not violate the First Amendment in doing so.

The Court of Appeals requirement that actual prejudice be shown conflicts not only with the "substantial likelihood" test set forth in *Gentile,* but also with the plain language of MRPC 3.6. Moreover, the Court of Appeals standard has no practical workability. It would be impossible to determine "actual prejudice" to a potential jury pool three years after the incident in question. We decline to order an evidentiary hearing that is no more than a fool's errand. The trial court narrowly tailored a restriction on plaintiff's and her counsel's speech consonant with the Michigan Rules of Professional Conduct. The trial court's limitation on plaintiff's and her counsel's speech was narrowly tailored and necessary to prevent prejudice to the potential jury pool and did not violate the First Amendment.

32

## IV. RESPONSE TO JUSTICE CAVANAGH'S DISSENT

Justice Cavanagh asserts that the majority opinion violates the First Amendment by restricting speech that does not have a substantial likelihood of materially prejudicing the proceedings. We reiterate that the narrow and necessary limitation on plaintiff's and her counsel's speech only applied to Bennett's expunged prior conviction that had been excluded as evidence. Plaintiff and her counsel remained free to discuss the general nature of her case and sexual harassment. We agree with Justice Cavanagh that the First Amendment does protect even offensive expressions, see, e.g., *R A V v City of St Paul*, 505 US 377; 112 S Ct 2538; 120 L Ed 2d 305 (1992). The First Amendment, however, does not protect all speech in whatever circumstances. See, e.g., *Adderley v Florida*, 385 US 39; 87 S Ct 242; 17 L Ed 2d 149 (1966). The United States Supreme Court has recognized the need to balance the rights of attorneys and litigants in pending cases and the state's interest in fair trials. In recognizing this tension, the Court has held that the First Amendment does not protect speech that has a substantial likelihood of materially prejudicing the proceedings. Contrary to Justice Cavanagh's implication that plaintiff is being punished for being discourteous and offensive toward the court, we affirm the dismissal of plaintiff's case solely because plaintiff and plaintiff's counsel made numerous references to excluded evidence, despite the trial court's oral warning that dismissal would result if such references continued, for the sole purpose of tainting the potential jury pool and denying defendants a fair trial.

Justice Cavanagh opines that plaintiff's and her counsel's references to the excluded evidence did not have a substantial likelihood of materially prejudicing the proceedings. We, however, fail to see how plaintiff's and her counsel's numerous public references to Bennett's prior indecent exposure conviction, after the court ordered the exclusion of that evidence, did not have a substantial likelihood of materially prejudicing this sexual harassment proceeding. The excluded indecent exposure conviction, which was subsequently expunged, involved sexual behavior that is very similar to the alleged sexual behavior in this case. It could be offered for no other purpose than to show Bennett's propensity to conduct himself in this manner. This is the exact type of evidence that MRE 404(b) precludes. If the narrow limitation on speech in this case cannot pass muster under the substantial likelihood test of *Gentile,* we fail to see what limitation could survive.[26]

---

[26] To reiterate, as stated in *Grievance Administrator v Fieger*, 476 Mich ___, ___; ___ NW2d ___ (Docket No. 127547, decided July 31, 2006), slip op at 34 n 34:

> Given the position advanced by the dissenting justices . . . , one wonders whether the dissenting justices would simply surrender the legal process to the least restrained and worst behaved members of the bar. With increasingly little need to adhere to the rules necessary to ensure public confidence in the integrity of the legal process, the dissenters would create a world in which legal questions come increasingly to be decided, not by a fair and rational search for truth, but by bullying and uncivil behavior, personal abuse, one-upmanship, and public exhibitionism on the part of those who are
>
> (continued . . .)

## V. CONCLUSION

We conclude that the trial court did not abuse its discretion in dismissing plaintiff's suit. We further hold that the trial court's explicit warning prohibiting any references to Bennett's excluded conviction did not violate the First Amendment. Accordingly, we reverse the judgment of the Court of Appeals and reinstate the trial court's order dismissing plaintiff's case. Because we hold that a dismissal is appropriate, we need not decide the remaining issue. Additionally, we do not reach the issues in plaintiff's cross-application because they are moot in light of our reinstatement of the trial court's order of dismissal.

Maura D. Corrigan
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

_____

(. . . continued)
custodians of this system, the bar. Justice under the law cannot flourish within such a system.

35

JUSTINE MALDONADO,

> Plaintiff-Appellee/
> Cross-Appellant,

v                                                              No. 126274

FORD MOTOR COMPANY,

> Defendant-Appellant/
> Cross-Appellee

and

DANIEL P. BENNETT,

> Defendant.

_____

CAVANAGH, J. (*dissenting*).

I agree with the majority that a trial court has the authority to control courtroom proceedings; however, this control must comport with the First Amendment. The desire for "preserving an organized polity," *ante* at 2, cannot be exercised at the expense of an individual's First Amendment right to free speech. Because I believe that the trial court abused its discretion when it dismissed plaintiff's case with prejudice and because I vehemently disagree with the majority's belief that its opinion today does not violate the Constitution, I must respectfully dissent. Further, because I agree with Justice Weaver that the

majority's decision undermines the basic tenets of our judicial system, I also concur with her dissent.

## I. THE STANDARDS FOR REVIEWING THE CONDUCT OF PLAINTIFF AND HER ATTORNEYS

Plaintiff Justine Maldonado's cause of action for sexual harassment against Daniel Bennett and defendant Ford Motor Company was dismissed with prejudice on August 21, 2002, because the trial court believed that plaintiff and her attorneys engaged in prejudicial pretrial publicity. The Michigan Rules of Professional Conduct (MRPC) have an established court rule that specifically governs trial publicity. MRPC 3.6 states:

> A lawyer shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer *knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding*. [Emphasis added.]

The United States Supreme Court examined the "substantial likelihood of material prejudice" standard in *Gentile v State Bar of Nevada*, 501 US 1030; 111 S Ct 2720; 115 L Ed 2d 888 (1991), in light of the First Amendment.[1] The Supreme

---

[1] The United States Constitution provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances. [US Const, Am I.]

The Michigan Constitution provides:

(continued . . .)

2

Court observed that this standard "imposes only narrow and necessary limitations on lawyers' speech." *Id*. at 1075. As the Supreme Court has also noted, "the likelihood, however great, that a substantive evil will result cannot alone justify a restriction upon freedom of speech or the press." *Bridges v California*, 314 US 252, 262; 62 S Ct 190; 86 L Ed 192 (1941). The evil must be substantial and "extremely serious and the degree of imminence extremely high before utterances can be punished." *Id*. at 263.

## II. THE CONDUCT OF PLAINTIFF AND HER ATTORNEYS WAS NOT SUBSTANTIALLY LIKELY TO MATERIALLY PREJUDICE THE TRIAL

The conduct of plaintiff and her attorneys was not substantially likely to materially prejudice the trial. When plaintiff filed her sexual harassment cause of action, the *Detroit Free Press* published an article about the filing on June 9, 2000. Plaintiff also held a press conference about the filing of her complaint. From that time forward, Bennett's indecent exposure conviction was a matter of public record, available to any member of the public, including any journalist.

Long before Bennett's indecent exposure conviction was ultimately expunged on November 9, 2001, and the trial court made a general statement to the parties about pretrial publicity on June 21, 2002, the indecent exposure

_____
(. . . continued)

> Every person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such right; and no law shall be enacted to restrain or abridge the liberty of speech or of the press. [Const 1963, art 1, § 5.]

conviction and the facts surrounding it were well-publicized. Accordingly, it is improper to blame plaintiff and her attorneys for every subsequent mention of Bennett's indecent exposure conviction, as the majority has, because information about his conviction was available from numerous sources. Journalists had access to this information from the time the complaint was filed, and journalists attended public courtroom proceedings, as they are allowed to do. Police reports were readily available to anyone who properly requested them. This information was contained in pleadings in the circuit court, the Court of Appeals, and this Court, and no objection was made. Further, the indecent exposure conviction was repeatedly discussed in open court. So regardless of whether plaintiff was the original provider of the information, any novice journalist willing to do a nominal amount of research would have ultimately discovered the conviction. See, e.g., *Gentile*, *supra* at 1046 (Kennedy, J.) (Although the petitioner shared the information with journalists, it was also "available to any journalist willing to do a little bit of investigative work.").

Over seven months after information about Bennett's indecent exposure conviction was first made known in relation to this case, on January 19, 2001, Judge Kathleen Macdonald granted a motion to exclude evidence of Bennett's indecent exposure conviction from plaintiff's trial.[2] Later, on February 16, 2001,

---

[2] Notably, Judge Macdonald recognized that this decision may not be final. She stated the following:

(continued . . .)

the trial court granted a motion to exclude any evidence related to Bennett's indecent exposure conviction. However, *these decisions did not preclude plaintiff and her attorneys from ever mentioning the indecent exposure conviction in public again*, and it is erroneous to attempt to portray them as such. While the majority refers to an order by Judge Macdonald that witnesses who mentioned Bennett's indecent exposure conviction would be considered in contempt of court, this order applied to *Lula Elezovic's case*, not plaintiff's case, and the order applied only to testimony given in court. This order did not restrict *plaintiff's* right to discuss Bennett's indecent exposure conviction in public settings as it relates to her case.

Notably, in between the two decisions excluding evidence of Bennett's indecent exposure conviction, on January 28, 2001, the *New York Times* published a lengthy article about the multiple claims of sexual harassment at defendant's plant. The article also mentioned Bennett's indecent exposure conviction, including a reference to the indecent exposure conviction made by the former plant manager for defendant's Wixom plant. Another article was published on

_____

(. . . continued)

>My ruling *right now* is that it [evidence of Bennett's indecent exposure conviction] will not be allowed even as to notice to Ford Motor. *That's my position now*. However, whenever I make a ruling in a vacuum outside the context of a trial, I'm always concerned that when I get in the middle of the trial and I find out I may have made a mistake, I will change my ruling. If I find the probative value of this evidence against only Ford Motor and somehow I can make a limited instruction so that somehow the jury won't take it as propensity evidence, *I would reconsider it. As of right now this evidence is excluded.* [Emphasis added.]

June 12, 2002, in the *Metro-Times*. In the article, plaintiff is quoted as saying, "They are investigating everything in my life, but not the man who did it to me, not the man who had the criminal record, was in a company car and exposed himself to high-school girls and was convicted of it." However, the article also stated that "[a]ccording to Ford and Bennett's attorney," plaintiff began weaving her tale after she learned of Bennett's indecent exposure conviction.[3] Bennett's attorney also talked about Bennett's indecent exposure conviction in the article, as well as how Bennett was falsely accused by the girls and how the conviction was expunged. Bennett's conviction was also mentioned by the attorney for Lula Elezovic, a woman who also alleged that Bennett sexually harassed her; Pamela Perez, another woman who alleged that Bennett sexually harassed her; and a former plant manager for defendant. While the majority contends that it was proper for the trial court to dismiss plaintiff's case with prejudice for mentioning Bennett's indecent exposure conviction, it conveniently ignores the fact that

---

[3] The majority characterizes these remarks as necessary responses to comments made by plaintiff and her attorneys. *Ante* at 9 n 11. The majority believes that saying that plaintiff is a lying opportunist who crafted her story after learning of the indecent exposure conviction is "not intended to taint the potential jury pool and cause prejudice to plaintiff." *Id*. I, however, believe that an objective reader of the facts of this case will recognize an analytical disparity in the majority's reasoning. Simply, if mentioning Bennett's indecent exposure conviction is—as the majority asserts—an attempt to influence the jury pool, then publicly arguing that plaintiff fabricated claims of sexual harassment in a desperate attempt to receive a large cash award from defendant is *exactly the same type of conduct that the majority finds so egregious*.

*defendant's attorney and Bennett's attorney also did the same* to advance their theory of the case to the public.

On May 17, 2002, another evidentiary hearing was held in front of Judge William Giovan.[4] At a conference in chambers, defendant's attorney requested a gag order directing plaintiff's attorneys not to publicize Bennett's expunged indecent exposure conviction. The court *declined to issue a gag order*.

In the course of another evidentiary hearing on June 21, 2002, the trial court briefly stated that it would dismiss the case if it found that a party was "causing some difficulty in our getting a fair jury . . . ." Yet this "explicit warning," as the majority repeatedly calls it, was so vague and fleeting that it cannot possibly take the place of a formal court order. It provided no guidance to the parties about what conduct was prohibited and clearly made no specific mention of Bennett's expunged conviction. Moreover, because the conviction had been previously referenced in the media and the trial court had *refused to issue a gag order to prohibit this conduct*, there can be no fair inference drawn from the trial court's offhand comment that it was now prohibiting any mention of the conviction.

It is important to note that the entire exchange about the possibility of dismissal occurred in an offhand manner as follows:

---

[4] Judge Giovan was assigned to the case after Judge Kathleen Macdonald was assigned to another division of the circuit court.

7

*Mr. Morgan* [*Bennett's counsel*]:  But first, they tried Mr. Bennett's deposition, and they unilaterally scheduled it for the 12th, knowing that they had fed the Metro Times with all the information for that horribly one-sided, inflammatory article that came out—[5]

*The Court*:  You think it was one-sided?

*Mr. Morgan*:  I haven't heard anyone comment to me to the contrary in the past week and a half.

*The Court*:  I will just tell you that I don't know who it was, but somebody thought that it made a fair presentation.  That's neither here nor there, if that makes you feel any better.

*Mr. Morgan*:  Well, the night before, and my client was ready to appear for the deposition in the *Perez* case.  We had filed a motion for a protective order that we had scheduled for the previous Friday, and that motion for a protective order was, number one, to have the judge limit—

*The Court*:  But, you know, since you mentioned that article, where's this coming from?  I thought that there is a prohibition against counsel speaking to—making public statements designed to affect litigation.

*Ms. Hardy* [*defendant's counsel*]:  There certainly is.  There's an ethics rule which prohibits counsel from intentionally trying to taint a jury pool by making the public aware of excluded evidence, which is exactly what's been occurring for quite some time.

*The Court*:  Is counsel being quoted in this?

---

[5] Part of this "one-sided" article states as follows:

Perhaps the plaintiffs are colluding to pick Ford's pockets. And perhaps Maldonado is the woman Ford portrays her to be—a greedy, sexually wanton, emotionally troubled ringleader of a conspiracy to gouge the company.

Or perhaps she and the other women are telling the truth.

*Mr. Washington* [*plaintiff's counsel*]: I think counsel on both sides. Ford was not, but Mr. Morgan and Ms. Massie [plaintiff's attorney] and I were both quoted, all quoted.

*The Court*: I'm not sure—well—

*Ms. Hardy*: It was initiated, without doubt, and Mr. Washington will not dispute this, by Mr. Washington, as all the press has been initiated by his office, and the constant publicity is one issue, but the really serious issue is the effort by Mr. Washington to make sure that the press continues to report evidence or information concerning this expunged conviction so that some way, somehow, irrespective of this Court's ruling—

*The Court*: I'm not making any decisions about this, but I'm going to tell you one thing. If I ever reach the conclusion that somebody is violating that ethical obligation and causing some difficulty in our getting a fair jury, I will dismiss the case with prejudice, or, and I should say, on the other side, grant a default judgment. I just want everyone to know that. And then whatever counsel is involved can answer to their client. [Emphasis added.]

Contrary to the majority's assertions, the trial court did not advise the parties "in no uncertain terms that references to the excluded conviction were to cease." *Ante* at 23 n 23. And the trial court did not "explicitly warn[] the parties and the attorneys that further references to the excluded conviction would result in dismissal." *Id*. In fact, there was no "explicit warning" that the case would be dismissed if remarks about the conviction were made, and there was no warning about what conduct would result in dismissal. A review of the quoted transcript of the exchange reveals that *not once* does the trial court even utter a word about the expunged indecent exposure conviction or excluded evidence.

Remarkably, I need only quote the trial court's own words to show the falsity of the majority's position that the trial court "explicitly warned the parties

9

that [it] would dismiss the case if the inappropriate remarks regarding the excluded conviction continued." *Ante* at 22. The trial court itself stated, "I told everybody then [at the May 17 hearing], certainly in chambers and maybe again after that on the record, I don't know that I repeated it on the record, that *I had no intention of telling anyone what they can say*." (Emphasis added.) At another hearing, the trial court stated, "I think I don't have the right to decide for myself what a lawyer can say to the public. I do not have that right." And finally and most importantly, "I have never issued such an order in my life." Therefore, I fail to see how the majority can characterize the trial court's words as being an "explicit warning" when the trial court itself does not believe it issued such a warning.

The trial court's own statements that it did not issue an order or warning that explicitly restricted what could be said should persuade a reasonable reader that no such order was entered or warning issued that prohibited the mention of the indecent exposure conviction. Yet the majority chooses to ignore this reality in favor of a factual scenario that it created and that it *wishes* had occurred. The majority attempts to portray an order excluding evidence from trial as having the same effect as an order precluding any mention of this evidence in public, and this erroneous portrayal is the crux of the majority's analysis. Remarkably, the majority's entire analysis relies on the faulty premise that two orders—one of which was never even entered—dealing with different topics and restricting different conduct can actually be the same. But an order excluding evidence is not magically transformed into an order precluding the mention of the evidence in

10

public no matter how much the majority wishes it were so. Unfortunately, I believe that the majority has steadfastly refused to acknowledge the difference because it would show that its analysis is insupportable.

While the majority labels as "preposterous" the dissent's position that an order excluding evidence from a trial is not the same as an order precluding the mention of this evidence in public, the majority never goes beyond name-calling to explain its position that an order excluding evidence now means that this evidence can never be mentioned in any forum again. Unfortunately, the majority's insistence on resorting to such tactics and its refusal to explain its position is becoming standard operating procedure whenever the majority cannot legally support its position. In this case, the majority so desires a specific outcome that it ignores the fact that an order excluding evidence cannot be labeled an order precluding mention of this evidence in public, and this blind adherence to its favored outcome leads it to espouse a position that is completely indefensible.

Moreover, the trial court's brief remarks at the evidentiary hearing about ethical obligations were made with no hearing or information about what plaintiff and her attorneys had or had not been doing. There is no indication that the trial court believed that plaintiff and her attorneys had been engaging in misconduct and that they must now cease any of their activities. The trial court's general comments were made in passing to both parties. *There was no formal or informal hearing on this matter*; there was only an extremely brief exchange. Also, contrary to the majority's contention, a comment made by plaintiff at a rally

protesting sexual harassment is not adequate evidence that plaintiff understood the trial court's June 21, 2002, "order." In response to a reporter's question at the rally, plaintiff stated that she was not going to quit fighting sexual harassment, even if that meant that her case would be dismissed. However, the news report does not show the question posed by the reporter that prompted plaintiff's statement. Notably, there was *no* mention of Bennett's expunged conviction during this news broadcast. What was mentioned during the broadcast was a statement by a spokeswoman for defendant, in which she said that she would not comment on the case, but she did note that the judge had asked those involved to refrain from drawing attention to the case. While the majority draws the conclusion from the broadcast that plaintiff somehow understood a limitation on referencing Bennett's expunged conviction when no such limitation was ever ordered or discussed by the trial court, I draw no such conclusion. It is highly probable that plaintiff was referring to the same directive that defendant's spokeswoman was referencing—that the trial judge asked the parties to refrain from drawing *unnecessary* attention to the case. But there is no indication that such a vague "request" was somehow transformed into an "order" regarding referring to Bennett's expunged conviction merely by plaintiff's comment.[6]

---

[6] Plaintiff's counsel later even sought more specificity and argued that the trial court's request was too vague to provide any guidance because "there's no way that any member of [plaintiff's] legal team could know when you had drawn a conclusion, as you said, that we were running afoul of the ethical rules . . . ."

As it relates to the conduct of plaintiff's attorneys, the majority states that it was misconduct for plaintiff's attorneys to have "appeared in television news broadcasts that specifically referred to Bennett's expunged conviction." *Ante* at 24. Yet, in over ten televised news reports, plaintiff and her attorneys do not once mention Bennett's indecent exposure conviction or the events that led to the conviction. Notably, the only person to comment off-camera on the conviction in one of the news reports is a spokesperson for *defendant*. Further, while the 1995 conviction is referenced in various televised news reports, an attorney for Bennett or defendant appears in each one of these reports. If it was misconduct for plaintiff's attorneys to appear in these reports, I fail to see why defendant is not being held to a similar standard.

I further note that, in a September 12, 2001, article by The Associated Press, it is *Bennett's* attorney who mentions the indecent exposure conviction, not plaintiff's attorneys. In an October 10, 2001, article in the *Detroit Free Press*, it is again Bennett's attorney who mentions the indecent exposure conviction as he characterizes plaintiff and the other women who allege sexual harassment by Bennett as women who are lying, looking for easier jobs, "out to make a quick buck," and attempting to capitalize on Bennett's indecent exposure conviction.

Notably, "in some circumstances press comment is necessary to protect the rights of the client and prevent abuse of the courts." *Gentile*, *supra* at 1058 (Kennedy, J.). "[A]n attorney may take reasonable steps to defend a client's reputation . . . ." *Id*. at 1043. In this case, defendant made numerous comments to

the media regarding plaintiff and her claims of sexual harassment. Bennett's and defendant's strategy was clear. Plaintiff was a liar. Bennett's attorney made repeated, explicit statements to the media—plaintiff and the other women who alleged sexual harassment were lying. Defendant's attorney stated that plaintiff had "credibility issues." In the June 12, 2002, *Metro-Times* article, Bennett's attorney said that plaintiff and the other women suing defendant and Bennett were lying about the harassment and were motivated in large part by greed. Defendant's defense was summarized as being that "Maldonado is an overweight opportunist who is colluding with co-workers to make a fortune by falsely accusing Bennett of sexual harassment and falsely accusing the company of doing nothing about it." Pretrial allegations against Maldonado included an assertion that she had had sex in a car in defendant's parking lot and frequently took her underwear off at work and hung it for all to see. And defendant's attorney repeatedly attempted to trivialize testimony and evidence that other women had been sexually harassed by Bennett by referring to this as "me too" evidence.

In light of the forceful and contentious tactics engaged in by both parties, I do not believe that the mere mention of an *expunged* conviction of indecent exposure that *some jurors might hear* had a substantial likelihood of materially prejudicing the trial. See, e.g, *Gentile*, *supra* at 1058 (Statements made by an attorney alleging that the police department and the prosecutor's office were corrupt were not substantially likely to materially prejudice the proceedings.). It is not surprising that *defendant* would make this argument because it would like as

14

little attention as possible paid to this case because it finds itself defending yet another sexual harassment claim involving Bennett. What is surprising, however, is that the majority agrees with defendant and takes the position that dismissal with prejudice is a reasonable response for the courts in a matter in which plaintiff and her attorneys have behaved in a manner *entirely consistent* with the actions of defendant's attorneys.

Simply, if plaintiff and her attorneys are criticized for seeking to influence the public perception of events by talking about Bennett's indecent exposure conviction, then I fail to see how defendant's attorneys were not attempting to do the same. Both parties sought to negatively portray their adversary's position in the media. While plaintiff is criticized by the trial court for sending out a press release, defendant also sent out press releases involving this case, yet it is only plaintiff who is being penalized with the extreme sanction of dismissal with prejudice.[7]

The attention paid to this case unmistakably shows that public interest is going to be more acute when the matter at issue is controversial. See *Bridges*, *supra* at 268. Sexual harassment, and, in this case, its alleged pervasiveness at defendant's facilities, is a matter of public interest that will engender public

---

[7] I also note that after investigating this matter, the state of Michigan's Attorney Grievance Commission did not find any evidence of misconduct that warranted further action, and it dismissed complaints filed by Bennett's attorney against plaintiff's attorneys.

discussion.[8]  As the *Detroit Free Press* reported in an October 10, 2001, article, various women complained of sexual harassment at defendant's Wixom plant, including women who were high-level supervisors.  In the article, a manager for the Michigan Department of Civil Rights stated, "'It's an extraordinary situation when you've got that many [sexual harassment complaints]. . . .  Filing a lawsuit is not something women take lightly.'"

Making this case an even bigger issue of public interest is the manner in which the judicial proceedings are conducted, and the allegation, supportable or not, that participants are not receiving fair treatment in our courts.  The public undoubtedly has an interest in ensuring that proceedings are conducted fairly.  But punishing comments made while the case is pending will "produce their restrictive results at the precise time when public interest in the matters discussed would naturally be at its height."  *Bridges*, *supra* at 268.  It is axiomatic that under the majority's rationale, cases that command the most public interest will be removed from the arena of public discourse.  See *id*.  It may take years to resolve a case, and the majority's position effectively silences negative critiques of the justice system and its parties during that time.  *Id*.  With this, I cannot agree.

---

[8] Other women have also alleged sexual harassment involving Daniel Bennett.  Notably, this Court has issued two other opinions involving similar allegations against Bennett.  See *Elezovic v Ford Motor Co*, 472 Mich 408; 697 NW2d 851 (2005); *McClements v Ford Motor Co*, 473 Mich 373; 702 NW2d 166 (2005).  Further, a majority of this Court addressed by order another case dealing with alleged sexual harassment by Bennett.  *Perez v Ford Motor Co No 2*, 474 Mich 1057 (2006).

## III. OTHER ADEQUATE AVENUES WERE AVAILABLE TO THE TRIAL COURT

The trial court had numerous other options to use before employing the drastic measure of dismissing plaintiff's case with prejudice.  The possibility that other less extreme measures could have been used by the trial court is a weighty factor that must be considered  See, e.g., *Landmark Communications, Inc v Virginia*, 435 US 829, 843; 98 S Ct 1535; 56 L Ed 2d 1 (1978).  The trial court could have required a continuance; moved the location of the trial; continued forward with sequestered, individualized voir dire; or continued forward with voir dire and a larger pool of jurors.  See, e.g., *Gentile*, *supra* at 1044 (Kennedy, J.).  At the very least, the trial court could have issued an *order* forbidding any future disclosure by the parties of Bennett's indecent exposure conviction.  There is no record that any of these options were seriously considered by the trial court.

The majority appears to argue that plaintiff would not comply with such an order.  But plaintiff's sarcastic and posturing comments to defense counsel that she had told people about the conviction and would continue to do so cannot seriously be deemed evidence from which it can be extrapolated that plaintiff would refuse to comply with an order *from the court*.  Notably, it is clear that the trial court never thought it issued an order to any of the parties.  The trial court stated:

> I don't believe in gag orders.  I've never issued a gag order. . . .  I have heard from time to time judges issuing orders personal to the attorneys saying you can't talk about this case, you can't do this, you can't do that.  I have never issued such an order in

17

my life. . . .  I haven't done it in thirty years and I didn't do it in this case.  [Emphasis added.]

Moreover, defendant's attorney knew that an order was not entered.  During a motion hearing, defendant's attorney reiterated the court's comment during a prior hearing that "you were not issuing an order . . . ."  During the same hearing, Bennett's attorney also said that he had asked the court to issue an order, but the court had declined.  And in any event, whether plaintiff theoretically would comply with such an order is unfounded speculation.  The critical fact is that plaintiff is suffering the ultimate punishment for violating an alleged "order" that was never even issued.

To fully understand this case and any comments made by plaintiff, it is important to note that during her deposition, plaintiff endured days of questioning.  At one point, her attorneys even filed a motion for a protective order barring further deposition questioning of plaintiff.  Plaintiff was questioned about her weight and her Internet habits.  Evidence was sought and plaintiff was also questioned about her sexual fantasies, prior sexual assaults, sexual habits, and religious beliefs, as well as her brother's drug addiction and her father's criminal past.  This case was highly contentious with defense counsel repeatedly claiming that plaintiff was lying so that she could receive a damages award.  Plaintiff's statement of defiance to opposing counsel cannot reasonably be deemed dispositive evidence that she would continue to discuss excluded evidence if ordered not to do so by the court.  While I do not condone disrespectful behavior

18

during depositions or during any aspect of a proceeding, plaintiff's response was a human, albeit inadvisable, response in light of the contentious proceedings. But the statement did not rise to such a level that her case should be dismissed with prejudice because she made it, and I vehemently disagree with the majority that doing so was within the range of reasonable and principled outcomes at the trial court's discretion.

Remarkably, the trial court expressed no real concern about the ability of jurors to impartially decide this case. During a hearing to decide defendant's motion to dismiss, the trial court stated it was not listening to arguments to determine if the conduct of plaintiff and her attorneys impaired defendant's right to a fair trial. The trial court stated, "I think it is often possible in high publicity cases to—you know, with appropriate safeguards, to try a case without—it may be difficult sometimes—without the publicity infecting the trial." Defendant's attorney agreed that the gravamen of the proceeding was about the "alleged misbehavior" of plaintiff and her attorneys in publicizing material and it was not whether defendant could receive a fair trial.

The majority now wants to portray this case as being about a defendant's right to a fair trial. See *ante* at 3. It claims that the "trial court's limitation on the speech of plaintiff and her counsel was a narrow and necessary limitation aimed at protecting potential jurors from prejudice." *Ante* at 3. But I fail to see how *necessary* it was when the trial court itself did not even consider this as a reason for dismissing the case with prejudice. While the majority now wants to portray

19

this case as being about a defendant's right to a fair trial because this portrayal better supports the majority's outcome, I find this depiction to be disingenuous at best because neither the trial court nor defendant itself viewed the case in this way.

## IV. THE CONDUCT OF PLAINTIFF AND HER ATTORNEYS DID NOT VIOLATE MRPC 3.5 AND MRPC 8.4

The majority states that the trial court did not rely on MRPC 3.5 and MRPC 8.4 in reaching its conclusion to dismiss plaintiff's case. However, the majority nonetheless examines the conduct of plaintiff and her attorneys in light of these rules to provide further evidence that the conduct warranted dismissal of plaintiff's sexual harassment cause of action. MRPC 3.5 states the following:

> A lawyer shall not:
>
> (a) seek to influence a judge, juror, prospective juror, or other official by means prohibited by law;
>
> (b) communicate ex parte with such a person concerning a pending matter, except as permitted by law; or
>
> (c) engage in undignified or discourteous conduct toward the tribunal.

Regarding MRPC 3.5, the majority refers to a "sarcastic" comment made by one of plaintiff's attorneys to the trial court. Further, the attorney also made a comment during a television interview that it was hard for a plaintiff to get a fair trial when the defendant is a large company like Ford Motor Company. This comment stemmed from plaintiff's filing of an emergency motion for disqualification of the trial judge because, in part, a member of the firm representing defendant who had entered appearances in the matter for defendant

20

was the reception chairperson for a "gala campaign reception" fundraising event for the judge at the Opus One Restaurant in Detroit. After failing to get plaintiff's attorney to disclose who shared the invitation with her and when, the trial judge refused to disqualify himself and then issued an order denying plaintiff's motion to dissolve the order excluding evidence related to Bennett's 1995 conviction. And later, on August 21, 2002, the trial court dismissed plaintiff's case with prejudice because it claimed that plaintiff and her attorneys had engaged in prejudicial pretrial publicity.

"There is no question that speech critical of the exercise of the State's power lies at the very center of the First Amendment." *Gentile*, *supra* at 1034 (Kennedy, J.). "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Mills v Alabama*, 384 US 214, 218; 86 S Ct 1434; 16 L Ed 2d 484 (1966). This includes "the manner in which government is operated or should be operated, and all such matters relating to political processes." *Id.* at 218-219. In *Gentile*, *supra* at 1033-1034, the defendant was an attorney who held a press conference that criticized the state for indicting his client and not indicting members of the police department, who he referred to as "crooked cops." This speech was protected by the First Amendment. *Id.* at 1058.

People may disagree about whether the comment by plaintiff's attorney about the bias of "Metro Detroit" judges was rude or forthright, crude or candid.

21

The statement could even be deemed unjustifiable. However, it was within the attorney's constitutional rights to make the statement. "The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion." *Bridges*, *supra* at 270. The essence of the right to free speech is that it gives the speaker the opportunity to express the speaker's viewpoints, valid or not. The citizens of Michigan are intelligent and do not need speech to be sanitized. It does not advance the ideals of the justice system to shelter the public from comments, even those that may be deemed unwarranted by some.

Moreover, there is nothing inherently undignified or discourteous in criticizing a court's decisions. In fact, a judge should expect these critiques as a "judge must expect to be the subject of constant public scrutiny." See Code of Judicial Conduct, Canon 2(A). But even if an attorney behaves in a manner that is deemed undignified or discourteous, then sanctions can be imposed against the *attorney*. Indeed, if every attorney who complained about a court's ruling had his client's case dismissed, the dockets of our state's courts would be cleared almost immediately.

At the outset of its opinion, the majority expresses a concern about "preserving an organized polity." *Ante* at 2. And I must note that I do not dispute that it would certainly be easier for a trial court to handle proceedings if there were no fear of criticism for its rulings. However, the ease of a trial court in managing its day-to-day affairs is not sufficient to infringe on plaintiff's First Amendment

rights in this case. Our citizens' constitutional right to free speech does not exist merely when it falls within the majority's narrowly defined "orderly" parameters. The First Amendment exists to protect speech—discourteous, disorderly, and sometimes downright offensive. "Freedom" is the first and foremost concern protected by the First Amendment, not order. The majority has offered nothing more than conjecture that the actions of plaintiff would impinge on the parties' right to a fair trial, but the lack of any real concern about a fair trial is particularly obvious when one considers that the *trial court itself did not have such a concern*. The majority further ignores that before speech can be punished, it must be determined to have a *substantial* likelihood of *materially* prejudicing the proceedings. See MRPC 3.6. Trial court proceedings are not protected by restricting an individual's right to criticize those very same proceedings.

Regarding MRPC 8.4, the rule states the following:

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) engage in conduct involving dishonesty, fraud, deceit, misrepresentation, or violation of the criminal law, where such conduct reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer;

(c) engage in conduct that is prejudicial to the administration of justice;

(d) state or imply an ability to influence improperly a government agency or official; or

(e) knowingly assist a judge or judicial officer in conduct that is a violation of the Code of Judicial Conduct or other law.

The majority states that plaintiff's counsel did not restrain plaintiff from publicizing Bennett's indecent exposure conviction and that plaintiff's attorneys participated with plaintiff in this "misconduct" on numerous occasions. The majority refers to MRPC 8.4(a), but I fail to see how plaintiff's attorneys engaged in misconduct through the acts of plaintiff. There is no evidence that plaintiff's attorneys counseled her to speak about Bennett's indecent exposure conviction. And I disagree that participating in a rally—a time-honored tradition in this country—and speaking to the media constitute "misconduct" that warrants dismissal of plaintiff's case with prejudice.

Finally, the majority states that remanding for an evidentiary hearing about the specifics of the conduct of plaintiff and her attorneys is "no more than a fool's errand" that it refuses to engage in. *Ante* at 32. While I disagree that the conduct of plaintiff and her attorneys had a substantial likelihood of materially prejudicing the trial, I fail to see what is foolish about remanding to specifically determine what happened, when, and why. When a person's First Amendment rights are at stake and the extreme sanction of dismissing a cause of action with prejudice has been ordered, the majority's steadfast refusal to examine the facts in light of the timetable of events is troubling to say the least.

24

## V. CONCLUSION

The First Amendment does not exist merely to protect courteous and genteel speech. The First Amendment "must be taken as a command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow." *Bridges*, *supra* at 263. Today, I believe that the majority has ignored the mandates of the Constitution in an ill-advised and unnecessary attempt at maintaining "order" in our courts. I believe that the comments of plaintiff and her attorneys fall well within the parameters of the First Amendment. Accordingly, I respectfully dissent and would affirm the decision of the Court of Appeals.

Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly

25

S T A T E   O F   M I C H I G A N

SUPREME COURT

JUSTINE MALDONADO,

        Plaintiff-Appellee/ Cross-
        Appellant,

v                                              No. 126274

FORD MOTOR COMPANY,

        Defendant-Appellant/ Cross-
        Appellee

and

DANIEL P. BENNETT,

        Defendant.

_____

WEAVER, J. (*dissenting*).

The majority's assertion that its decision today is "[a]t the heart of preserving an organized polity" is false. *Ante* at 2. I concur fully in Justice Cavanagh's dissent because I agree that the circuit court's dismissal of plaintiff's case violated her First Amendment right to free speech.

In addition to the First Amendment violation, I write to explain that the premise of the circuit court's dismissal of plaintiff's case had no legal validity and, therefore, the majority's acrobatic effort to justify its decision to affirm the circuit court's order does not preserve an organized polity, it undermines it.

An organized polity is governed by the law and is preserved by courts that apply the law and objectively state the facts. In this case, the circuit court did not establish a legal foundation for its dismissal of plaintiff's case, it acted on a whim. The circuit court's decision was, therefore, an abuse of discretion. Now, the majority legitimizes the circuit court's order by misstating the facts of the case and misapplying the law. The majority's decision abuses this Court's appellate review power and, therefore, is inconsistent with the preservation of an ordered polity.

The circuit court in this case dismissed with prejudice plaintiff Justine Maldonado's sexual harassment action against defendant Ford Motor Company and Ford's employee, defendant Daniel P. Bennett. The circuit court premised its dismissal on pretrial publicity that it attributed to plaintiff and plaintiff's lawyers and referred to defendant Bennett's prior conviction for indecent exposure in an unrelated case. The circuit court found that the publicity violated the Michigan Rules of Professional Conduct, MRPC 3.6. The Rules of Professional Conduct govern the conduct of lawyers. MRPC 3.6 prohibits lawyers from making extrajudicial statements about a case that might materially prejudice judicial proceedings. Despite the fact that MRPC 3.6 only applies to the conduct of lawyers and the fact that there is no evidence that her lawyers violated the rule, the circuit court opined that Ms. Maldonado's activities could be imputed to her lawyers and dismissed the case.

The question presented is whether the circuit court's dismissal with prejudice of Ms. Maldonado's case was an abuse of discretion. I would hold that

it was an abuse of the circuit court's discretion to dismiss plaintiff's case for the reasons set forth below, and for those stated well by Justice Cavanagh in his dissent.

I

Because the majority mischaracterizes facts pertinent to understanding this case, the following time line lists the important dates and events in this case's history:

- June 9, 2000: Ms. Maldonado files her sexual harassment cause of action.

- June 9, 2000: The *Detroit Free Press* publishes an article referring to defendant Bennett's unrelated indecent exposure conviction. The pending case, including statements about the case by both sides, is regularly in the media thereafter.

- January 19, 2001: Judge Kathleen Macdonald grants the motion to exclude from plaintiff's trial evidence of defendant Bennett's prior and unrelated indecent exposure conviction.

- February 16, 2001: Judge Macdonald enters an order excluding from plaintiff's trial evidence of defendant Bennett's prior and unrelated indecent exposure conviction.

- September 11, 2001: Plaintiff's lawyers issue a press release referring to defendant Bennett's prior and unrelated conviction for indecent exposure.

3

- November 2001: Defendant Bennett's prior and unrelated conviction for indecent exposure is expunged.

- June 21, 2002: During a hearing regarding the motion to dissolve Judge Macdonald's order to exclude evidence of the expunged and unrelated indecent exposure conviction, Judge William Giovan warns the parties about pretrial publicity and states that if a party violates some ethical obligation, the case could be dismissed.[1]

- July 3, 2002: During a hearing on plaintiff's motion for Judge Giovan's disqualification, Judge Giovan states on the record that his prior warning was *not a court order*.

- August 21, 2002: During a hearing on defendant's motion to dismiss the case, defendant's attorney states that the case was in the news again. Judge Giovan dismisses the case with prejudice.

---

[1] Specifically, Judge Giovan said:

> I'm making any decisions about this, but I'm going to tell you one thing. If I ever reach the conclusion that somebody is violating that ethical obligation and causing some difficulty in our getting a fair jury, I will dismiss the case with prejudice, or, and I should say, on the other side, grant a default judgment.

The majority incorrectly characterizes this warning by suggesting that "Judge Giovan expressly warned plaintiff that if she continued to disseminate information regarding Bennett's excluded conviction in violation of Judge Macdonald's, order he would dismiss her case." *Ante* at 26. Contrary to the majority's characterization, the warning issued by Judge Giovan simply warned the parties to not violate any ethical obligation. Judge Macdonald's order only excluded the evidence from trial, not the public forum.

4

II

The circuit court did not establish a legal foundation to support its dismissal of Ms. Maldonado's case. The court based its dismissal of Ms. Maldonado's case on her and her attorneys' alleged violation of the Michigan Rules of Professional Conduct, MRPC 3.6. The violation identified by the circuit court involved pretrial publicity by Ms. Maldonado and her attorneys regarding defendant Bennett's prior conviction for indecent exposure, which Judge Giovan suggested violated Judge Macdonald's order to exclude that evidence from trial.

The circuit court's attempt to hold Ms. Maldonado responsible for a violation of MRPC 3.6 is unsupportable. MRPC 3.6 only applies to lawyers. The rule states:

> A *lawyer* shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the *lawyer* knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding. [Emphasis added.]

Judge Giovan's opinion reveals that he was aware that MRPC 3.6 does not apply to nonlawyers. Nevertheless, he concluded that a nonlawyer client "is not immune for knowingly doing what [her lawyers] cannot." MRPC 3.6 does not apply to nonlawyers; therefore, it was an abuse of discretion to base the dismissal of Ms. Maldonado's case on her violation of a rule that does not apply to her.

Further, Judge Giovan failed to identify any violation of MRPC 3.6 by Ms. Maldonado's attorneys that warrants dismissal of the case. Judge Giovan noted that her lawyers "appeared in television news broadcasts that made specific

5

references to Mr. Bennett's criminal conviction." However, Judge Giovan did not identify a specific instance when the lawyers themselves mentioned the conviction in these broadcasts or publications. My review of the record reveals that the lawyers did not themselves refer to the conviction.

It is true that one year before Judge Giovan heard the defendant's motion to dismiss and two months before defendant's prior conviction was expunged, the law firm representing Ms. Maldonado issued a press release that referred to defendant Bennett's prior conviction. Judge Giovan found that the press release violated MRPC 3.6, suggesting that the lawyers knew trial was imminent when the press release was issued. But the information about defendant's prior conviction referred to in the press release was already well-publicized. Thus, it cannot be concluded that, when the press release was issued, a reasonable person would have expected that the content of the release would likely prejudice an adjudicative proceeding materially. Furthermore, contrary to the majority's assertion otherwise, because Bennett's prior conviction was well-publicized before plaintiff's lawyer's 2001 press release, the press release cannot be considered the source for all subsequent news publications that referred to the prior conviction.

Judge Giovan also suggested that the press release somehow violated Judge Macdonald's February 16, 2001, order, which excluded evidence of defendant's prior conviction from trial. However, while Judge Macdonald's order excluded the evidence of defendant's prior conviction from trial, it did not prohibit any and all public reference to the prior conviction by either plaintiff or plaintiff's

6

lawyers.[2]  For these reasons, it was not reasonable for Judge Giovan to premise his dismissal of plaintiff's case on the actions of her lawyers.

The majority admits that MRPC 3.6 does not apply to Ms. Maldonado because she is not a lawyer.  *Ante* at 25.  Further, like Judge Giovan, the majority fails to identify any specific instances in which Ms. Maldonado's lawyers violated MRPC 3.6.  But, rather than acknowledging the circuit court's abuse of discretion in relying on MRPC 3.6 to dismiss Ms. Maldonado's case, the majority grasps for and creates its own alternative justifications for the circuit court's order.

---

[2] After Judge Giovan took the case over from Judge Macdonald, defendant Ford and defendant Bennett filed a joint motion for entry of an order directing that the witnesses be instructed regarding excluded evidence and impermissible testimony on July 21, 2002.  In their brief supporting their request, defendants stated that every witness in the *separate* trial of *Elezovic v Ford Motor Co* had to

> sign off on a statement indicating that they had been advised of the ruling by the Court regarding inadmissible evidence, and that they were not to mention anything about any excluded evidence, and that they understood the consequence for mentioning any of the excluded evidence would be sanctions including contempt and imposition of all the costs of a mistrial.  Defendants request the same process in this case.

The defendants apparently hoped that Judge Giovan would issue an order in this case like that which Judge Macdonald had issued in the *Elezovic* case to prevent witnesses from mentioning defendant Bennett's prior conviction during their testimony on the witness stand.  But Judge Giovan did not issue any such order.

In any event, the *Elezovic* order appears to have only limited the witnesses' speech inside the courtroom; it was directed at preventing impermissible testimony during the *Elezovic* trial regarding defendant Bennett's prior conviction that Judge Macdonald had ordered to be excluded from the evidence.

7

The majority's primary justification for its decision to affirm the order of dismissal is the need for *order in the court*. In this case, the majority concludes that the dismissal of Ms. Maldonado's case was authorized under MCR 2.504(B)(1), which provides:

> If the plaintiff fails to comply with [the court] rules or a court order, a defendant may move for summary dismissal of an action or a claim against that defendant.

However, the mere fact that the court rule permits the circuit court to dismiss a case does not mean that dismissal is justified on a whim. By the plain terms of MCR 2.504(B)(1), there must be a violation of an applicable court rule or order to justify a summary dismissal of a case.

To make it seem like MCR 2.504(B)(1) justifies the dismissal of plaintiff's case, the majority intentionally misstates the facts to make it appear that plaintiff and plaintiff's lawyers violated a court order. The majority states: "Judge Giovan expressly warned plaintiff that if she continued to disseminate information regarding Bennett's excluded conviction in violation of Judge Macdonald's order he would dismiss her case. Plaintiff failed to obey this warning and, thus, Judge Giovan properly dismissed her case." *Ante* at 26. This is untrue. The facts are: (1) Judge Giovan's warning was not an order of the court,[3] (2) there *never* was a

_____

[3] Referring to the warning at the July 3, 2002, hearing on plaintiff's motion for his disqualification, Judge Giovan said: "I want to say a thing about gag orders. You've called what I said in court a gag order. Not so. As a matter of fact, I don't believe in gag orders. I've never issued a gag order."

court order limiting pretrial publicity or references to defendant Bennett's prior conviction, (3) Judge Macdonald's order excluding evidence of defendant Bennett's conviction for indecent exposure from plaintiff's sexual harassment trial imposed no limitation on pretrial publicity, and (4) Judge Giovan did not premise his dismissal on plaintiff's violation of his warnings; instead, he incorrectly attributed plaintiff's activities to her lawyers to support his conclusion that they had violated MRPC 3.6.

The majority also relies heavily on the assertion throughout its opinion that plaintiff's lawyers were themselves quoted publicly referring to Bennett's prior conviction. Contrary to the majority's assertion, none of the broadcasts or articles cited by the majority quoted or discussed any statements by Ms. Maldonado's lawyers regarding Bennett's prior conviction for indecent exposure. In those broadcasts and articles, Ms. Maldonado's lawyers made statements about the case and about their perception that the circuit court was biased, but not about the expunged conviction. Immediately after Judge Macdonald ruled that the conviction would be excluded, which was months before Judge Giovan was assigned the case, the lawyers were quoted as saying that they would appeal that order. Thereafter, all quoted statements about Bennett's prior conviction were made by Ms. Maldonado, and Ms. Maldonado was not restricted by any order or court rule from making repeated public reference to Bennett's prior conviction.

It was an abuse of discretion for Judge Giovan to attribute to plaintiff's lawyers responsibility for statements made by plaintiff and the press about the

well-known fact that Bennett had a prior conviction for indecent exposure. It does not serve an organized polity for the majority to affirm a ruling that was based on a whim rather than the law.

III

A cornerstone for an organized polity is that courts of law will act in an orderly way, as opposed to acting on a whim. In an organized society, disputes are taken to a court of law for adjudication because a court is impartial and will handle cases with fairness and pursuant to the law. Dismissing Ms. Maldonado's case without a legal foundation is the same as dismissing the case on the basis of a whim. The majority's decision to affirm the circuit court's order damages the integrity of the judicial system and, contrary to the majority's rhetoric, undermines the basic tenets of an organized society.

Elizabeth A. Weaver<br>
Marilyn Kelly